No. 08-1026

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

ALBERT SNYDER,
Plaintiff/Appellee,
vs.
WESTBORO BAPTIST CHURCH, INC., et al.,
Defendants/Appellants,

_____

Appeal from the District of Maryland
Trial Court Judge: Honorable Richard D. Bennett
District Court Docket Number 06-CV-1389

_____

# **BRIEF OF APPELLANT**

Margie J. Phelps
3734 SW 12th St.
Topeka, KS 66604
785.408.4598 - ph
785.233.0766 – fax
margie.phelps@cox.net
Attorney for Defendants/Appellants

## CORPORATE DISCLOSURE STATEMENT

Defendants/appellants Westboro Baptist Church Inc. (WBC), Fred Phelps (Phelps),   Shirley Phelps-Roper (Phelps-Roper) and Rebekah Phelps-Davis (Phelps-Davis) hereby state:

1. They are **not a publicly held corporation** or other publicly held entity.

2. They do **not** have any **parent corporation**.

3. **No** publicly held corporation or other publicly held **entity owns 10%** or more of the stock of WBC; WBC has no stockholders.

4. **No** publicly held corporation or other publicly held **entity has a direct financial interest** in the outcome of the litigation to their knowledge.

5. They are **not** a **trade association**.

6. This case does **not** arise out of a **bankruptcy** proceeding.

# <u>TABLE OF CONTENTS</u>

**CORPORATE DISCLOSURE STATEMENT** ...................................................II

**JURISDICTIONAL STATEMENT** ................................................... 1

**STATEMENT OF THE ISSUES** ..................................................... 1

**STATEMENT OF THE CASE** ......................................................... 3

**STATEMENT OF FACTS** ............................................................... 3

**SUMMARY OF ARGUMENT** ......................................................... 8

**ARGUMENT** ..................................................................................... 9

Issue 1:  The trial court lacked personal jurisdiction over defendants. ..................................................................9

Issue 2:  The trial court lacked subject matter jurisdiction over matters of religious opinion. ..........................11

Issue 3:  Plaintiff had no privacy right in his son's funeral or his own mourning under the circumstances of this case. ...............................................................14

Issue 4:  Defendants' speech was on issues of public interest, in public places, and thus should not have been treated as private speech or as torts. ...............................17

Issue 5:  Assuming a privacy right exists, it was not properly balanced with defendants' First Amendment rights, and the restrictions were not content-neutral, reasonable in time, place or manner, or narrowly tailored. ...............................................................18

Issue 6:  The punitive damages award violates due process; because there is no evidence of malice; it was based upon alleged injuries of many people besides plaintiff; and, it would bankrupt defendants. ..................20

Issue 7:  The verdict was the product of passion and bias and violates due process. ...........................................23

Issue 8:  There were prejudicial evidentiary errors in the trial. ...............................................................27

Issue 9:  A corporation cannot conspire with itself; and, the verdict against WBC is a double penalty against the individual defendants. ...............................................28

Issue 10:  The statutory cap on compensatory damages should have been applied in this case. ..........................29

Issue 11:  A stay without bond should have been granted in this case. ...............................................29

**CONCLUSION** .............................................................................. 30

**REQUEST FOR ORAL ARGUMENT** ...................................................... 31

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(E) OR 32(A)**............................ 31

**CERTIFICATE OF SERVICE**........................................................................... 32

# <u>TABLE OF AUTHORITIES</u>

## Cases

*ALS Scan, Inc. v. Digital Service Consultants, Inc.* 293 F.3d 707 (4th Cir. 2002)....................... 19

*Atlas Food Systems and Services, Inc. v. Crane National Vendors, Inc.*, 99 F.3d 587, 593-96 (4th Cir. 1996) ......................................................................................................... 30

*BEP, Inc. v. Atkinson*, 174 F.Supp.2d 400, 409 (D.Md. 2001)....................................................... 38

*Blethen Maine Newspapers, Inc. v. State of Maine*, 871 A.2d 523, 533-534 (Maine 2005) ........ 25

*Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) .................................................................................................... 23

*Brown v. State of Louisiana*, 383 U.S. 131, 133, footnote 1, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) ................................................................................................................................. 30

*Brown v. United States Patent and Trademark Office*, 2007 WL 446601 at 1 (4th Cir. 2007)..... 33

*Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).............................................................................................................................. 18

*Caterpillar, Inc. v. Sturman Industries, Inc.*, 387 F.3d 1358, 1366-67 (4th Cir. 2004)................ 33

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) ..................................................................................................... 22

*Colucci v. Agfa Corp. Severance Pay Plan*, 431 F.3d 170, 176 (4th Cir. 2005) ........................... 38

*Connick v. Meyers*, 461 U.S. 138, 147-148, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).................. 27

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985)......................................................................................................... 27

*Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647-50 (4th Cir. 1999)................................................. 19

*Federal Election Commission v. Wisconsin Right to Life, Inc.*, --- U.S. ---, 127 S.Ct. 2652, 2666, 168 L.Ed.2d 329 (2007) ............................................................................................. 30

*Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) ................................. 23

*Hill v. Colorado*, 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) ................................. 24

*Hugger v. Rutherford Institute*, 2004 WL 765067 at 3 (4th Cir., 4/12/04)................................... 27

*Hunley v. Godinez*, 975 F.2d 316, 318 (7th Cir. 1992).................................................................. 33

*McQueary v. Stumbo*, 453 F.Supp.2d 975 (E.D.Ky. 2006) ........................................................... 25

*National Archives and Records Administration v. Favish*, 541 U.S. 157, 124 S.Ct. 1570, 158 L.Ed.2d 319 (2003) ..................................................................................................... 24

*National Funeral Services, Inc. v. Rockefeller*, 870 F.2d 136, 141 (4th Cir. 1989) ...................... 28

*New York Times Co. v. Sullivan*, 376 U.S. 254, 265, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) ........ 28

*Phelps-Roper v. Nixon*, 509 F.3d 480 (8th Cir. 2008) (rehearing en banc pending) .................... 25

*Phelps-Roper v. Taft*, 523 F.Supp.2d 612 (N.D. Ohio 2007) ....................................................... 26

*Philip Morris USA v. Williams*, --- U.S. ---, 127 S.Ct. 1057, 1065, 166 L.Ed.2d 940 (2007), *cert. granted a second time after remand*, --- S.C.t ---, 2008 WL 791949 (6/9/08) ........................ 31

*Potter-Shackelford Construction Co, Inc. v. Law Engineering, Inc.*, 104 F.3d 359, 1996 WL 732331 at 6 (4th Cir. 1996)................................................................................................ 30

*Saunders v. Branch Banking and Trust Company of Virginia*, --- F.3d ---, 2008 WL 2042620 at 7 (4th Cir., 5/14/08) .......................................................................................................... 32

*Savala v. Freedom Communications, Inc.*, 2006 WL 1738169 at 8 (Cal.App. 5 Dist., 6/27/06) . 25

*Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir. 1991) .............................................................. 38

*Schenck v. Pro-Choice Network of Western N.Y.*, 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997)................................................................................................................................... 24

*Showler v. Harper's Magazine Foundation*, 2007 WL 867188 at 5 (10th Cir., 3/23/07), *cert. denied*, 128 S.Ct. 196, 169 L.Ed.2d 37 (2007) ....................................................... 25

*Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) ................................ 33

*Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976)............................. 37

*United States v. Bly*, 510 F.3d 453, 457-458 (4th Cir. 2007)......................................................... 23

*United States v. Cooper*, 482 F.3d 658, 662-63 (4th Cir. 2007)..................................................... 37

*United States v. Georgia Pac. Corp.*, 562 F.2d 294 (4th Cir. 1977) ............................................. 39

*United States v. Smith,* 452 F.3d 323, 330 (4th Cir.), *cert. denied,* --- U.S. ----, 127 S.Ct. 694, 166 L.Ed.2d 539 (2006) .................................................................................................................... 37

*Virginia v. Black*, 538 U.S. 343, 364-366, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) ................. 29

*Ward v. Rock Against Racism*, 491 U.S. 781, 796, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ..... 24

*Young v. New Haven Advocate*, 315 F.3d 256 (4th Cir. 2002) ...................................................... 19

### **BRIEF OF APPELLANT**

Appellants Westboro Baptist Church (WBC), Fred Phelps (Phelps), Shirley Phelps-Roper (Phelps-Roper) and Rebekah Phelps-Davis (Phelps-Davis) submit the following brief in this matter. "Vol." refers to the 15-volume Appendix submitted with this brief.

## Jurisdictional Statement

The basis for the district court's subject matter jurisdiction: Plaintiff claimed jurisdiction based on diversity, per 28 U.S.C. § 1332, which defendants dispute. The basis for the court of appeals' jurisdiction: 28 U.S.C.A. § 1291, Final decisions of district courts. The filing dates establishing the timeliness of the appeal: October 31, 2007, verdict; November 5, 2007, judgment; post-trial motions November 8, 2007 and November 14, 2007; order on post-trial motions February 4, 2008. Notice of Appeal November 30, 2007, February 13, 2008, February 24, 2008 and May 1, 2008. This appeal is from a final order or judgment that disposes of all parties' claims, in that it is an appeal from a verdict, judgment entered on the verdict, and rulings on post-trial motions timely filed.

## Statement of the Issues

1.     The trial court lacked personal jurisdiction over defendants.

2.      The trial court lacked subject matter jurisdiction over matters of religious opinion.

3.      Plaintiff had no privacy right in his son's funeral or his own mourning under the circumstances of this case.

4.      Defendants' speech was on issues of public interest, in public places, and thus should not have been treated as private speech or as torts.

5.      Assuming a privacy right exists, it was not properly balanced with defendants' First Amendment rights, and the restrictions were not content-neutral, reasonable in time, place or manner, or narrowly tailored.

6.      The punitive damages award violates due process, because there is no evidence of malice; it was based upon alleged injuries of many people besides plaintiff; and it would bankrupt defendants.

7.      The verdict was the product of passion and bias and violates due process.

8.      There were prejudicial evidentiary errors in the trial.

9.      A corporation cannot conspire with itself; and, the verdict against WBC is a double penalty against the individual defendants.

10.     The statutory cap on compensatory damages should have been applied in this case.

11.     A stay without bond should have been granted in this case.

## Statement of the Case

This is an appeal from a verdict in favor of a soldier's father, against a church, its pastor, and two members, for picketing outside the soldier's funeral, talking to the media, and posting an epic on a passive Website.

## Statement of Facts

Plaintiff's son was killed in Iraq on March 3, 2006, when a Humvee he was in flipped, when the driver lost control after ignoring orders to slow down (Snyder, Vol. VII, 2064 & Vol. VIII, 2137; Vol. XIII, 3667-3671). After his son's death, plaintiff talked to the media about his life, death, and funeral (Timothy Phelps, Vol. IX, 2334; Vol. II, 375-381; Snyder, Vol. VIII, 2150-2151; Phelps-Davis, Vol. IX, 2358). Funeral notices were published in two papers and on the funeral home's Website (Vol. XV, 3763-3768; Vol. VIII, 2158-2162).

Before March 7, 2006, a group called the Patriot Guard coordinated with the church, law enforcement and funeral home, and then on March 7, 2006, published its plan to attend (Beckwell, Vol. IX, 2321-2324).

On March 8, 2006, WBC issued a press release that it would picket in connection with the funeral (Timothy Phelps, Vol. IX, 2334-2335).

Media was expected at the funeral because plaintiff talked to them before the funeral (Snyder, Vol. VIII, 2140, 2150-2151). They sought but did not receive

permission to come onto the church campus (Patalinghug, Vol. VIII, 2251; Snyder, Vol. VII, 2081). They stayed after defendants left, filming the funeral procession (Fisher, Vol. X, 2649; Vol. XV, 3808, and DVD).

The funeral was held March 10, 2006 (Vol. XV, 3770). The priest who was the main celebrant was not aware of any picketing; heard no one speak of picketers; saw no disruption of the funeral; and centered the congregation on the funeral (Dobranski, Vol. X, 2635-2643). The priest responsible for coordination of logistics picked a place for defendants to stand and routed traffic away from them; and arranged for the blinds in the school to be closed, so the children in the school were "completely blocked" (Patalinghug, Vol. VIII, 2239-2265).

The funeral was held at St. John's Catholic Church, Vol. IX, 2497-2499; Vol. XV, 3757 and 3758). The church was out of defendants' sight, over 1000 feet away, and the entrance used by funeral goers and the procession was up a hill also out of sight (Kramer, Vol. IX, 2475-2491; Vol. XV, 3796 and DVD; Phelps, Vol. VIII, 2218-2219; Phelps-Roper, Vol. IX, 2495; Phelps-Davis, Vol. IX, 2366; Long, Vol. VIII, 2294). Plaintiff saw only tops of signs, and stayed focused on his deceased son (Snyder, Vol. VII, 2079-2080, Vol. XI, 2832). Defendants did not enter the church; plaintiff did not hear them; and, they were gone when he left the church (Snyder, Vol. VII, 2081, Vol. VIII, 2165, 2167-2168).

All 1200 seats of the church were full; strangers attended and no one was blocked from the funeral (Patalinghug, Vol. VIII, 2257-2258; Snyder, Vol. VIII, 2164). The service was a beautiful military ceremony full of pageantry with Marine pallbearers, a moving tribute (Fisher, Vol. X, 2651-2652, Snyder, Vol. VII, 2081, Vol. VIII, 2168-2172). Funeral goers walked through a tunnel of flags, and passed children and Patriot Guard members lining the road on the way to the cemetery, as well as citizens, law enforcement, emergency responders and fire fighters, all honoring plaintiff's son (Snyder, Vol. VII, 2080-2082, Vol. VIII, 2168-2172; Fisher, Vol. X, 2651-2653; Vol. XV, 3759-3762).

Members of the press had a designated spot off church grounds; plaintiff did not see or hear them, and they did not approach the funeral procession (Snyder, Vol. VIII, 2174; Maas, Vol. VIII, 2272). After the funeral plaintiff talked to the media about his son, his death, and his funeral (Snyder, Vol. VIII, 2151-2154).

Plaintiff received an outpouring of support, including hundreds of supportive e-mails, calls and cards, and other community support. (Snyder, Vol. VII, 2069, 2084, Vol. VIII, 2173-2174; Fisher, Vol. X, 2661-2662).

Defendants contacted law enforcement to advise they would be picketing, for peace-keeping (Vol. XV, 3776; Maas, Vol. VIII, 2267-2268). Police personnel identified the location where defendants stood (Maas, Vol. VIII, 2272-2273; Long, Vol. VIII, 2285-2286), and there was no violence or yelling (Long, Vol. VIII,

2286-2287; 2293).   Defendants left when the funeral started (Long, Vol. VIII, 2289-2290, 2294; Vol. XV, 3777; Phelps-Davis, Vol. IX, 2371).

Defendants' signs said, "Don't Pray for the USA," "God Hates Fags," "God Hates You," "God Hates America," "God's View/Not Blessed Just Cursed," "Semper Fi Fags," "Pope in Hell," "God Hates the USA/Thank God for 911" "You're Going to Hell,"[1] "Fag Troops," "Thank God for Dead Soldiers," "Thank God for IEDs," and "Priests Rape Boys"  (Vol. VI, 1588-1589; Vol. XV, 3784-3787; Phelps, Vol. VIII, 2232).

After the funeral, plaintiff saw news stories that included signs and comments by defendants (Snyder, Vol. VIII, 2112, Vol. VII, 2072-2074, 2085-2087). Searching for stories about his son, five weeks after the funeral, plaintiff found, read and shared a document (epic) on defendants' Website (Vol. XV, 3788; Phelps-Roper, Vol. IX, 2407-2408; Snyder, Vol. VII, 2062, 2083, 2176-2179).

After plaintiff sued, defendants claimed lack of personal and subject matter jurisdiction, and protected speech (Vol. I, 39, 69, 196, 199; Vol. II, 208; Vol. III; 794; Vol. IV, 1050, 1141, 1188; Vol. V; Vol. VI, 1586, Vol. VI, 1853-1854; Vol. VII, 1863; Vol. IX, 2312; Vol. I, 81, also *Snyder v. Phelps*, 2006 WL 3081106 [D.Md. 10/30/06]; 206, 207; Vol. III, 876; Vol. IV, 902, also *Snyder v. Phelps*,

---

[1] Plaintiff and his counsel referred at trial to a sign saying, "He's in Hell," or "You're in Hell," yet the record shows there was no such sign, e.g., Snyder, Vol. VII, 2086; Blumberg, Vol. XI, 2777; Vol. XV, 3782-3788.

2007 WL 3071412 [D.Md. 6/5/07]; 906, 1018, Vol. V; 1402; Vol. VI, 1643; Vol. IX, 2439-2461; Vol. XI, 2798-2799; 2846-2847).

On October 15, 2007, summary judgment was granted on the defamation claim, because the epic contained "religious opinion," and there was no loss of reputation (Vol. V, 1214-1219); and, on invasion of privacy by publishing private facts, because no private facts were published (Vol. V, 1224-1227).

The court denied summary judgment on intrusion upon seclusion based on the content of three signs, "God Hates You," "You're Going to Hell," and "God Hates Fags" (Vol. V, 1255, 1273), saying the "key factor" was that they could be "interpreted" as targeting plaintiff (Vol. V, 1274-1279, 1298-1300). The Court said "Don't Pry for the USA" and "Pope in Hell" were protected (Vol. V, 1259-1261, 1299).

The court said the time frame for liability was the immediate aftermath of the funeral, a few days (Vol. V, 1355-1357); on or about March 10, 2006 (Vol. V, 1358-1359). When Phelps-Roper pointed out that the epic was written five or six weeks later, the trial court expanded the time to five or six weeks (Vol. V, 1359).

Plaintiff claimed his depression and worsening of pre-existing diabetes was caused partly by defendants (Mann, Vol. VII, 1958-2031; Willard, Vol. VII, 2032-2031). A psychologist who reviewed the records and did an exam, and endocrinologist who reviewed the records, said the death of plaintiff's son was the

cause of his depression and flare up of his diabetes (which by trial was well controlled), and that event was so significant and had so much impact, it was not possible to quantify any increase in depression or diabetes symptoms due to defendants' words (Boehm, Vol. X, 2551-2582; Blumberg, Vol. XI, 2746-2797).

During trial, because of the claim that the signs specifically targeted plaintiff or his son, defendants played sign movies that had been video taped before the March 10, 2006 funeral, explaining the signs (Timothy Phelps, Vol. X, 2663-2673; Vol. XV, 3797-3808).

The jury returned a verdict of $2.9 in compensatory damages and $8 million in punitive damages (Vol. XII, 3136, 3140). The court denied post-trial motions, but remitted the verdict to $5.1 million, *Snyder v. Phelps*, 533 F.Supp.2d 567 (D.Md. 2008).

## Summary of Argument

The verdict is based on content and an illusive or inapplicable privacy right. Defendants' speech was about public issues, and the funeral was a public event. The jury was instructed if any words were offensive, outrageous, vulgar or shocking, defendants were liable, not the standard for public speech.

The court treated defendants' words as private speech, and told the jury the words were less protected. The Supreme Court has not recognized a privacy right the funerals or mourning; and such a right would not apply here given plaintiff's

public discussion of the facts of his son's life, death and funeral.  Even if a privacy right existed here, it should be balanced against defendants' speech on public issues, allowing only content-neutral reasonable time, place and manner restrictions.  The court set a time restriction of weeks past the funeral; and allowed speech at *no* location, and in *no* manner, if the words reached plaintiff's ears, and he interpreted them as targeting him or his son.  The court created a floating buffer zone around plaintiff, which is unconstitutionally overbroad.  The jury's passions were inflamed, and punitive damages were based on alleged injuries to many besides plaintiff.  The verdict is well beyond the full net worth of all the defendants combined, and there was no evidence of malice to support punitive damages.

## Argument

### Issue 1:  The trial court lacked personal jurisdiction over defendants.

*Standard of Review*:  The standard of review regarding personal jurisdiction is de novo, *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).

*Discussion of Issues*:  March 10 was the first time Phelps-Roper had been to Maryland, and she went to Maryland only two more times to picket from March 10 to the date she was sued; Phelps-Davis had been to Maryland four times to picket before she was sued (Vol. II, 312-313; 352-353); there is no evidence Phelps has been to Maryland on any occasion other than this picket, or that defendants own

9

any property, have offices, or do any kind of business in Maryland (Vol. XII, 3079; Vol. XIV 3663, 3683; also see Phelps-Davis, Vol. IX, 471).

"In determining whether specific jurisdiction exists, we consider (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable'" *Carefirst, supra*, 334 F.3d at 397.

Defendants came to Maryland for a few hours to stand on public sidewalks and lawfully picket. Jurisdiction is more tenuous because of the trial court's holding that location did not matter. Defendants could have stayed in Topeka – as plaintiff argued – and their words reach plaintiff's ears. Maryland has no legitimate interest in words said by citizens of Kansas heard by citizens of Pennsylvania. Maryland's interests are protected by its law limiting funeral picketing to 150 from the funeral (e.g., Vol. V, 1202).

This Court said in *Carefirst, supra*, *Young v. New Haven Advocate*, 315 F.3d 256 (4th Cir. 2002), and *ALS Scan, Inc. v. Digital Service Consultants, Inc.* 293 F.3d 707 (4th Cir. 2002), that words on a passive Website did not provide sufficient contacts for personal jurisdiction. There were not sufficient contacts for personal jurisdiction.

10

### Issue 2: The trial court lacked subject matter jurisdiction over matters of religious opinion.

*Standard of Review:* The standard of review on subject matter jurisdiction is de novo, *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647-50 (4th Cir. 1999).

*Discussion of Issues:* Defendants have been picketing on public right-of-ways for 18 years; addressing the sins of this nation, out of their belief that the Scriptures require them to testify to their fellow citizens to warn them of the consequences of sin; their duty to watch current events and apply Scripture to those events; and their belief that they are obligated by the Bible to go into the public arenas, and say these words to the whole world. They have Websites and signs all of which are integral to their core doctrinal beliefs (Calvinism, including total depravity, predestination, limited atonement, election and reprobation). They direct their words to all of mankind, and seek effective lawful ways to get the words to as many people as possible, including through the media. They know their words are hated almost universally; but they believe that is irrelevant to the duty to publish.

An religious historian testified, who personally disagrees with defendants,[2] saying defendants' religious practices, and preaching about hell to sinners

---

[2] One of the things this religious historian personally disagrees with is picketing soldiers' funerals (Balmer, Vol. X, 2606, 2621); the trial court seized upon this as his basis for saying the signs targeted plaintiff or his son, and that this was not protected by the First Amendment (Vol. XI, 2880). This was so even though the trial court adamantly insisted on October 15 that this witness would not be permitted to testify to anything about the First Amendment (Vol. V, 1318-

everywhere, including by picketing, is well established in history (Balmer, Vol. X, 2584-2634).

Defendants act out of a love for God, the Bible, and their fellow citizens. Their words are seemingly harsh and graphic, because of the crisis they perceive to exist, and because of the reality of the woes coming upon the nation.  They are sincere in these beliefs, and study the Scriptures and expositors daily.

Defendants testified about their religious beliefs and words in detail (Phelps, Vol. VIII, 2190-2191, 2195-2201, 2211-2212, 2215-2217, 2222-2235; Timothy Phelps, Vol. IX, 2328-2355; Phelps-Davis, Vol. IX, 2358-2374 and Vol. X, 2547-2550; Timothy Phelps, Vol. X, 2663-3681; Phelps-Roper, Vol. IX, 2409-2411; 2417-2418; 2421-2434 & 2492, 2450-2537; Fred Phelps, Jr., Vol. IX, 2467-2474).   Testifying to their doctrines and beliefs was the only way they could defend this case, because the trial record is full of criticism of their beliefs, by plaintiff, his attorneys, and the trial court.  Plaintiff's testimony included turning to defendants and saying, "don't tell me it's love," (Vol. VII, 2073); "their hatred makes me sick," hatred "towards everybody really," (Vol. VIII, 2112); the soldiers in Iraq are "not fighting for hate speech," (Vol. VIII, 2115); defendants were "passing judgment on all priests," with "Priests Rape Boys" (Vol. VIII, 2115);

---

1322); and even though the Supreme Court has recognized that speakers on public issues in public places are entitled to reach their target (intended) audience, e.g., *U. S. Postal Service v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 145, 101 S.Ct. 2676, 269369 L.Ed.2d 517 (1981).

defendants should get out if they don't like the country (Vol. VIII, 2116); he prays for defendants' children (Vol. VIII, 2119); he was upset that children were holding signs (Vol. VIII, 2120); the epic contains "more of their Bible hatred," and defendants don't talk about what God does good (Vol. VIII, 2131-2132); he disagrees this is the United States of Sodom (Vol. VIII, 2136); it is upsetting that anybody would say God killed anyone (Vol. VIII, 2137); and, he doesn't remember anything in the Bible saying to hate (Vol. VIII, 2154-2155).

Government is required to be neutral on religion, and government action that targets one religion will rarely survive strict scrutiny, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). The trial court explicitly held that the content of the words was the basis for submitting the case to the jury. This case punished defendants' religious belief that they are prophets and God's elect; their belief in God's hate; and their belief in the doctrines of reprobation, election and predestination.[3] The jury should not have had the opportunity to put the official governmental stamp of disapproval on defendants' religious beliefs.

---

[3] The trial court disagreed with celebrating death. The priest who conducted the funeral called himself the lead *celebrant*. Timothy Phelps testified, if a member of WBC died, it would be a time of rejoicing, because precious in the sight of the Lord is the death of his saints, Psalm 115:16. Government is not qualified to determine which celebratory view about funerals or deaths is accurate.

**Issue 3:  Plaintiff had no privacy right in his son's funeral or his own mourning under the circumstances of this case.**

*Standard of Review:* The standard of review on First Amendment issues of law is de novo, *United States v. Bly*, 510 F.3d 453, 457-458 (4th Cir. 2007); also see *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

*Discussion of Issues:*  The Supreme Court has not recognized a privacy right in mourning.  The Court has recognized a residential privacy right, *Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), though the use of a residence as a place of business or public meeting "may present somewhat different questions," 487 U.S. at 488.  The Court has recognized a government interest in protecting citizens from unnecessary noise in a park, *Ward v. Rock Against Racism*, 491 U.S. 781, 796, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), and has recognized privacy at a medical clinic where women go for abortions, *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994), though a ban against "images observable" from the windows burdened more speech than necessary, because this could only be based on the patients finding content disagreeable, and no more was required to avoid seeing placards through the windows than to close the blinds, 512 U.S. at 773.  (Plaintiff stopped watching the news when his son was in Iraq, Vol. VII, 2065.)   The Court disapproved a floating buffer zone to protect privacy, *Schenck v. Pro-Choice*

14

*Network of Western N.Y.*, 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997), and only approved a narrowly tailored 100-foot buffer in *Hill v. Colorado*, 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

It is tempting to say privacy in funerals was established by *National Archives and Records Administration v. Favish*, 541 U.S. 157, 124 S.Ct. 1570, 158 L.Ed.2d 319 (2003).  However, that case involved photos of the deceased, and was based on a broader statutory right under the Freedom of Information Act, not the common law tort of invasion of privacy.  "We have observed that the statutory privacy right protected by Exemption 7(C) goes beyond the common law and the Constitution," *Favish, supra*, 541 U.S. at 170.  Speech on public issues must be balanced against any privacy right, *Blethen Maine Newspapers, Inc. v. State of Maine*, 871 A.2d 523, 533-534 (Maine 2005) (privacy interests of deceased priests did not preclude disclosure of records under *Favish* reasoning because of the great importance of the issue of alleged sexual abuse in the clergy).  Also see *Savala v. Freedom Communications, Inc.*, 2006 WL 1738169 at 8 (Cal.App. 5 Dist., 6/27/06) (no privacy cause of action at common law for intrusion into private thoughts).

The Tenth Circuit rejected plaintiff's argument that he had a privacy interest in the funeral of his relative, a soldier killed in Iraq from Oklahoma, after a photographer took a picture of his body in the casket, and included it in a

publication for profit, in *Showler v. Harper's Magazine Foundation*, 2007 WL 867188 at 5 (10th Cir., 3/23/07), *cert. denied*, 128 S.Ct. 196, 169 L.Ed.2d 37 (2007). The Court said *Favish* was based on statutory language broader than the common law, and, did not apply because of the public nature of the funeral.

In *Phelps-Roper v. Nixon*, 509 F.3d 480 (8th Cir. 2008) (rehearing en banc pending), the Court reversed a denial of a preliminary injunction concerning the Missouri law restricting funeral picketing, finding a likelihood of success on the merits. The Court noted the decision in *McQueary v. Stumbo*, 453 F.Supp.2d 975 (E.D.Ky. 2006), which assumed without finding, for the purpose of preliminary injunction, that the state had an interest in protecting funeral attendees from unwanted communications so obtrusive they were impractical to avoid; and the decision in *Phelps-Roper v. Taft*, 523 F.Supp.2d 612 (N.D. Ohio 2007) (on appeal to the Sixth Circuit, argued 2/08), which found a significant state interest in protecting citizens from disruption during the events associated with a funeral or burial service.

These cases pertained to time, place and manner restrictions on picketing near a funeral, not to the mourning process, or subjective interpretations of the content of picket signs or other words. Ohio court struck the floating buffer zone, and Kentucky struck several overbroad provisions. If this case pertained to the

Maryland 150-foot law, this would be a very different discussion.  No court has authorized restrictions on mourning periods, based on content of words.

### Issue 4:  Defendants' speech was on issues of public interest, in public places, and thus should not have been treated as private speech or as torts.

*Standard of Review*:  The standard of review on issues of law under the First Amendment is de novo, *United States v. Bly, supra; Bose Corp., supra.*

*Discussion of Issues*:  The trial court treated defendants' speech as private, and instructed the jury it was private, with less protection.  This was based on the court's view that plaintiff's son was not a public figure, and that the funeral was private.  This Court has said that whether speech addresses a matter of public concern must be determined by the content, form and context of the speech, as revealed by the whole record, *Hugger v. Rutherford Institute*, 2004 WL 765067 at 3 (4th Cir., 4/12/04), quoting *Connick v. Meyers*, 461 U.S. 138, 147-148, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and citing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985).

It misses the mark to focus on whether plaintiff or his son were public figures (which might be); or whether the plaintiff asked the media not to come inside at the funeral (though he clearly knew they would be outside).  These questions don't answer whether defendants were speaking about topics of public importance, or about facts made available to the public.  The record shows clearly

that every fact defendants addressed about plaintiff or his son, plaintiff published. Further, more importantly, the topics addressed on the picket signs, in comments to the media, and in the epic, were all topics of vital public interest, including the deaths of soldiers in Iraq, the moral condition of this nation, the priest sex scandal in the Roman Catholic Church, and divorce. Further, Maryland law requires a private matter be published for invasion of privacy to apply; and for injury to be severe for intentional infliction of emotional distress to apply.

### Issue 5: Assuming a privacy right exists, it was not properly balanced with defendants' First Amendment rights, and the restrictions were not content-neutral, reasonable in time, place or manner, or narrowly tailored.

*Standard of Review*: The standard of review for issues of law under the First Amendment is de novo, *United States v. Bly, supra; Bose Corp., supra.*

*Discussion of Issues:* Even if a privacy right in mourning exists, that right was not properly balanced against defendants' public speech rights. Restrictions on speech by the government must be content-neutral, which clearly this restriction was not. The trial court found that content-neutrality was not required because this was a private case, not a criminal prosecution (e.g., Vol. V, 42-44; Vol. IX, 2446-2447). The Supreme Court rejected that reasoning, in *New York Times Co. v. Sullivan*, 376 U.S. 254, 265, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964): "Although this is a civil lawsuit between private parties, the Alabama courts have applied a state

rule of law which petitioners claim to impose invalid restrictions on their constitutional freedoms of speech and press. It matters not that that law has been applied in a civil action and that it is common law only …." Further, the Supreme Court has stated that judicial decrees pose greater risks of censorship and discriminatory application than do general ordinances, *Hill v. Colorado, supra,* 530 U.S. at 713, quoting *Madsen, supra*, 512 U.S. at 764. Since the verdict is based on content, the reasonable time, place and manner restriction option is not available, see *National Funeral Services, Inc. v. Rockefeller,* 870 F.2d 136, 141 (4th Cir. 1989): "The essence of time, place, and manner restrictions is content neutrality. The disregard of content is why such restrictions are given more deferential review than are other speech restraints." Even if the time, place and manner restrictions were available here, the restrictions here went far beyond reasonable.

The court effectively created a floating buffer zone around plaintiff. In order to comply with the restrictions the trial court imposed, defendants — or anyone else – would have to know what TV station plaintiff would watch, what newspapers he would read, and what sites on the Internet he would visit. This is an impossible standard to meet, which is why floating buffer zones are not allowed.

Further, the verdict burdens far more speech than necessary. When all the speech (protected and unprotected) is presented to the jury, with a broad instruction allowing for liability if any of the language is deemed offensive or unprotected, the

restriction is overbroad, because it allows more speech to be burdened than the unprotected speech which the government has a legitimate interest in restricting, see *Virginia v. Black*, 538 U.S. 343, 364-366, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003). "Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals," *Ward v. Rock Against Racism, supra*, 491 U.S. at 799.

Protected speech can not be deemed unprotected because of the reaction of a particular segment of the target audience. "Such a test "'puts the speaker … wholly at the mercy of the varied understanding of his hearers,'" *Federal Election Commission v. Wisconsin Right to Life, Inc.*, --- U.S. ---, 127 S.Ct. 2652, 2666, 168 L.Ed.2d 329 (2007). See also *Brown v. State of Louisiana*, 383 U.S. 131, 133, footnote 1, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (breach of the peace is not chargeable to a lawful peaceful speaker). Plaintiff's interpretation of the signs as targeting him or his son is not a valid basis for restricting the speech (Vol. VII, 2087; Vol. VIII, 2113, 2115-2118, 2120-2121, 2138, Vol. VIII, 2180.

### Issue 6: The punitive damages award violates due process; because there is no evidence of malice; it was based upon alleged injuries of many people besides plaintiff; and, it would bankrupt defendants.

*Standard of Review:* Review of a punitive damages award not supported by sufficient evidence is de novo, *Potter-Shackelford Construction Co, Inc. v. Law Engineering, Inc.,* 104 F.3d 359, 1996 WL 732331 at 6 (4th Cir. 1996). Review of

the amount of punitive damages requires the Court to make an independent review to determine whether the award will result in a miscarriage of justice, and a remittitur is reviewed for abuse of discretion, *Atlas Food Systems and Services, Inc. v. Crane National Vendors, Inc.*, 99 F.3d 587, 593-96 (4th Cir. 1996).

*Discussion of Issues*:  Maryland law and due process require a showing of malice for an award of punitive damages.  There is no evidence of malice in this case, in the absence of a characterization of defendants' religious beliefs.  As discussed at issue 7 below, malice was argued based on religious beliefs, such as defendants' beliefs that they are God's elect, and his prophets/angels on earth; because defendants were not sorry for their message; because their signs use the word "hate;" because defendants are not thankful for plaintiff's son's sacrifice; and because of the "manic" looks on their children's faces in the sign movies.  None of these characterizations of defendants' religious beliefs constitute malice for purposes of punitive damages.

There are multiple instances in the record where the alleged injuries of persons other than plaintiff were presented to the jury, including plaintiff's family (Snyder, Vol. VIII, 2115-2116, 2121); victims of the bridge collapse in Minnesota and the Amish children killed in Pennsylvania (Snyder, Vol. VIII 2124-2125); anyone defendants say God killed (Snyder, Vol. VIII, 2137); all the Marines in Iraq (Snyder, Vol. VIII, 2115); plaintiff's housemate and daughter (Vol. XI, 2928);

all the sons and daughters of citizens of Maryland in the military (Vol. XII, 3055); and all the families of the men and women going overseas (Vol. XII, 3063).

The Supreme Court has said that it violates due process for the state to inflict punishment for harm "caused strangers to the litigation," *Philip Morris USA v. Williams*, --- U.S. ---, 127 S.Ct. 1057, 1065, 166 L.Ed.2d 940 (2007), *cert. granted a second time after remand*, --- S.Ct. ---, 2008 WL 791949 (6/9/08); and that the state cannot authorize procedures that create an unreasonable and unnecessary risk of the jury taking into account harm caused others "under the rubric of reprehensibility," *ibid*.

Maryland law prohibits bankrupting a defendant with punitive damages. This runaway jury awarded damages in an amount over ten times the total net worth of all the defendants, if they liquidated all their assets, and waived homestead and other exemptions. The punitive damages verdict violates Maryland law, which was established to ensure due process.

When reviewing a punitive damages award, courts are to consider 1) the degree of reprehensibility, 2) the disparity between harm suffered by plaintiff and the award, and 3) the difference between the amount of the verdict and civil penalties imposed for comparable behavior, *Saunders v. Branch Banking and Trust Company of Virginia*, --- F.3d ---, 2008 WL 2042620 at 7 (4th Cir., 5/14/08). Reprehensibility is only reached here by characterizing religious beliefs, and fully

22

accepting plaintiff's broad attack on defendants' doctrines and religious opinions. As noted above, reprehensibility can not be the basis for folding strangers with alleged injuries into the equation. The only evidence that plaintiff suffered harm, was evidence that he is angry at the sentiments and opinions of the defendants, and churns that anger with his doctor, therapist and house mate. The alleged injury directly flows from disagreement with religious opinion. This award of millions is against defendants of modest means, though Maryland has determined a fine of $100 is in order.

### Issue 7: The verdict was the product of passion and bias and violates due process.

*Standard of Review*: The standard of review for jury bias is de novo, *Caterpillar, Inc. v. Sturman Industries, Inc.*, 387 F.3d 1358, 1366-67 (4th Cir. 2004), and for judicial bias whether an objective observer would entertain a significant doubt about the judge's impartiality, *Brown v. United States Patent and Trademark Office*, 2007 WL 446601 at 1 (4th Cir. 2007) .

*Discussion of Issues*: Juror bias is found in a) Juror 13 serving on the jury, and b) the inflaming of the passions of the jury. Judicial bias is found in numerous statements by the trial court of hostility towards defendants' religious beliefs.

Juror 13 lives in Westminster, Maryland, a mile and a half from St. John's Church; has been a member of the church for 17 years; and served in the United

States Air Force, including in combat in Vietnam (Vol. VI, 1719, 1721-1722, 1770, 1793). Defendants tried to inquire further and moved to strike for cause, which were denied (Vol. VI, 1721-1722). While the Supreme Court has held that the question of whether an individual juror is biased is entitled to deference on review, in extreme or extraordinary cases, bias can be presumed from the circumstances, *Caterpillar, Inc. v. Sturman Industries, Inc., supra*, citing *Hunley v. Godinez*, 975 F.2d 316, 318 (7th Cir. 1992), quoting *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). This trial evoked strong emotions in everyone involved, and was extraordinary in many ways. Common sense says that a juror who served in combat, and who attends the church picketed would have difficulty being fair and impartial, no matter what he said to the contrary.

The passions of the jurors were inflamed. When the sign movies were shown, three jurors were in tears. During closing, these passions were inflamed, by replaying the videos, and by strong language about defendants' religious views. Counsel spoke of the "disgusting" videos and Webpage; the "circus" defendants brought to Maryland; a "71-person cult" harassing people all over the country; the "nonsense" of a Bible story and defendants' interpretation of the Bible; defendants shouldn't go all over the country telling people they're going to hell and irreversibly doomed (Vol. XI, 2919-2920, 2923, 2926, 2932). Plaintiff's counsel complained of children holding signs and flags, mocked defendants' use of the

term "earth dweller," and criticized all the signs at the picket (Vol. XI, 2929, 2930-2931, 2935-2936). During deliberations, the jury asked for a Bible (which the court denied) (Vol. XII, 3027-3028).

In closing argument regarding punitive damages, plaintiff's counsel argued malice was found in defendants saying they were the prophets, the seers, the sword in the hand of God, who claimed to know God's will; in picket signs with the word "hate;" and in defendants not apologizing for the message (Vol. XII, 1132). They also said malice came from the manic looks on the children's faces in the sign movies, and because they celebrated the death of plaintiff's son (Vol. XII, 1131-1133).

The trial court made statements reflecting his bias against defendants' religious views. (Sometimes these were in the presence of jurors; sometimes not; they impacted the level of tension and the ability of defendants or their counsel to present their case.)

For instance, the court told Phelps-Roper that there was not time for her to "pontificate" on her various viewpoints (Vol. IX, 2311); when Phelps-Roper was testifying, the court suddenly put a 12-minute time limit on her (Vol. IX, 2433); when ruling on Rule 50 motions, the court said God Hates You meant "we're all going to hell apparently," and that Phelps-Davis had testified that 99.9% of mankind are going to hell, which would apparently include people in the

courtroom (Vol. IX, 2445); the court described the epic as four or five pages of rambling, and shortly after when Phelps-Roper stood to address the court, the court told her to "take it easy" and "sit down" (Vol. IX, 2444); the court stated that defendants "define themselves" as a church, though only ten or twenty members have joined in fifty years (Vol. IX, 2445); the court said if Phelps-Roper started "opining" on her views of intermingling between the Bible and the First Amendment he was going to put some limits on her (Vol. IX, 2461); the court required Phelps-Roper to be sworn when she took the stand a second time, though this was not required of plaintiff (Vol. IX, 2492); when Phelps-Roper was testifying, and began speaking of Isaiah 63, plaintiff's counsel requested permission for plaintiff to leave the courtroom, which the court allowed in the presence of the jury (Vol. IX, 2531-2533); when Timothy Phelps was testifying and playing sign movies, plaintiff's counsel again sought permission for plaintiff to leave the courtroom, with the court saying in the presence of the jury, "You may be excused, Mr. Snyder. You don't have to watch this" (Vol. X, 2668-2669); after the sign movie for Thank God for 911 was played, at which point jurors were crying (Vol. X, 2672-2673; Vol. XI, 2856-2857; 2864-2865), the court made a point of questioning the witness (Timothy Phelps) about who the narrator was on the movie, and whether she was a member of the church (Vol. X, 2670); when the jury asked for a Bible during deliberations, when defense counsel offered one, the court

26

said, "I don't need to see it, Mr. Katz.  I've seen it before, sir, I can assure you" (Vol. XII, 3028).

One of these standing alone may not be prejudicial; all of them in this trial was prejudicial.  Defendants requested a mistrial (Vol. X, 2691), which was denied (Vol. XI, 2856-2857).

## Issue 8:  There were prejudicial evidentiary errors in the trial.

*Standard of Review*:  The standard of review for evidentiary issues is abuse of discretion, or plain error if the evidentiary issues are cumulative, *United States v. Cooper*, 482 F.3d 658, 662-63 (4th Cir. 2007); *United States v. Smith,* 452 F.3d 323, 330 (4th Cir.), *cert. denied,* --- U.S. ----, 127 S.Ct. 694, 166 L.Ed.2d 539 (2006). *Discussion of Issues*:  The trial court held that the epic was religious opinion, and dismissed the defamation claim.  Then the court allowed the epic to be admitted.  Plaintiff testified that the words of the epic were lies.[4]  His doctor referred to it as libel, and the court admitted his records with this language over defendants' objection (Mann, Vol. VII, 105, 1989, 1994-1999).  This amounted to a defamation claim by another name, without any instruction to the jury on truth as

---

[4] A key issue in the epic, part of the basis for the defamation claim, was Phelps-Roper's statement that plaintiff taught his son to commit adultery, by divorcing his wife.  Since the truthfulness of this statement was put in issue, in spite of summary judgment on the defamation claim, defendants should have been allowed to inquire about the sexual activity of plaintiff, which the trial court denied (Vol. V, 1329-1344; also see orders at Vol. I, 13, Doc. 140 & 16, Doc. 181).

a defense or fault, see *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976).

It was also prejudicial error to permit evidence of events other than the picket and epic at issue  (Snyder, Vol. VIII, 2124, 2127-2128 [pickets related to non-soldier-funeral events]; Timothy Phelps, Vol. X, 2678-2680 [writings July 2007 or later].)

Admitting the treatment records of plaintiff (especially since portions had been redacted over defendants' objection, Vol. I, 1/29/07 hearing transcript, 135-158), plus the written opinions of these witnesses, was unduly prejudicial. (Record, Mann, Vol. VII, 1999, 2017; Willard, Vol. VII, 2046-2048).

### Issue 9:  A corporation cannot conspire with itself; and, the verdict against WBC is a double penalty against the individual defendants.

*Standard of Review:*   The standard of review on a motion to dismiss is de novo, *Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir. 1991).

*Discussion of Issues:*  It is a legal impossibility for a corporation to conspire with its agents, *see Snyder v. Phelps*, 2006 WL 3081106 at 11 (D.Md. 10/30/06), citing *BEP, Inc. v. Atkinson*, 174 F.Supp.2d 400, 409 (D.Md. 2001).  The awards against WBC  ($2 million in punitive damages reduced to $1 million), increased the penalty against the individual defendants.

**Issue 10: The statutory cap on compensatory damages should have been applied in this case.**

*Standard of Review*: Issues of law are reviewed de novo, *Colucci v. Agfa Corp. Severance Pay Plan*, 431 F.3d 170, 176 (4th Cir. 2005)

*Discussion of Issues*: The trial court held that the statutory cap of Md. Code. Ann., Cts. & Jud. Proc. §11-108(b)(2)(ii) did not apply because this case involves intentional torts, relying on *Cole v. Sullivan*, 676 A.2d 85 (Md.Ct.Spec.App. 1996), see *Snyder v. Phelps, 533* F.Supp.2d 567, 585-87 (D.Md. 2008). This ignores the plain language of the statute, which makes no exception for intentional torts, and violates equal protection requirements, causing insurance corporations to receive more protection than religious corporations. The basis for *Cole's* conclusion is that the law was passed to protect insurance companies, so they could sell insurance at lower rates, raised to cover litigation costs. Protecting the insurance industry from costs is not rationally related to treating alleged intentional torts different from alleged acts of negligence. See Vol. XIV, 3603, 3628.

**Issue 11: A stay without bond should have been granted in this case.**

*Standard of Review:* The grant or denial of a stay and setting of a bond is reviewed for abuse of discretion, *United States v. Georgia Pac. Corp.*, 562 F.2d 294 (4th Cir. 1977). *Discussion of Issue:* Defendants reserve and reassert their claim that a stay should have been granted without bond.

## Conclusion

"[W]e are a society – including, in that society, the news media – that is fixated on death."[5]  The whole nation and the world are talking about the soldiers dying in Iraq, and the priest sex scandal.  This kind of public discourse is the essence of why the First Amendment exists.  This verdict is a governmental expression of hostility against defendants' unpopular religious words.  The trial was fraught with constitutional infirmity, and can not stand under the law or Constitution.  Defendants are entitled to an order setting aside the verdict and dismissing plaintiff's claims with prejudice.

---

[5] Calvert, Clay, *The Privacy of Death: An Emergent Jurisprudence and Legal Rebuke to Media Exploitation and a Voyeuristic Culture*, 26 Loy. L.A. Ent. L. Rev. 133, 169 (2005-2006).

# Request for Oral Argument

Appellants request oral argument due to the significant constitutional issues in this case, including some of first impression.

Respectfully submitted,

/s/ Margie J. Phelps

_____

Margie J. Phelps
3734 SW 12th St.
Topeka, KS 66604
785.408.4598 - ph
785.233.0766 – fax
margie.phelps@cox.net
Attorney for Defendants/Appellants

# Certificate of Compliance with Rule 28.1(e) or 32(a)

1.    This brief complies with the type-volume limitations of Fed.R.App.P. 28.1(e)(2) or 32(a)(7)(B) because this brief contains 6915 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii), as counted by the word-processor used to prepare this brief.

2.    This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 using 14-point *Times New Roman* font.

/s/ Margie J. Phelps

_____

Margie J. Phelps

# Certificate of Service

I hereby certify that the foregoing corrected *Brief of Appellant* was filed electronically, and on June 20, 2008, the following service occurred:

Eight (8) copies of the *Brief of Appellant* was sent by Express Mail to:

Clerk of the United Sates Court of Appeals
  for the Fourth Circuit
Lewis F. Powell Jr. United States Courthouse Annex
1100 East Main Street, Suite 501
Richmond, VA 23219-3517
**ATTENTION:  Ms. Sarah A. Carmichael**

And one (1) copy of said *Brief of Appellant* was mailed by regular mail to:

| | |
|---|---|
| Mr. Sean E. Summers, Esq. | Mr. Craig Trebilcock, Esq. |
| Barley Snyder LLC | Shumaker Williams PC |
| 100 E Market St | 1 East Market Street, S 204 |
| PO Box 15012 | York, PA 17401 |
| York, PA 17401 | |

Further, on June 13, six (6) copies of *Brief of Appellants - Volumes 1 – XV*, together with four (4) copies of the eight (8) DVDs listed and referenced therein, were sent by Fed Ex Express (3-day delivery guaranteed) to the Clerk's Office at the above address; and the same date one (1) copy of the Appendix and DVDs were sent to Mr. Sean E. Summers by Fed Ex Ground at the same address.

/s/ Margie J. Phelps
_____

Margie J. Phelps