No. 08-1026

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

ALBERT SNYDER,
Plaintiff/Appellee,

vs.

WESTBORO BAPTIST CHURCH, INC., et al.,
Defendants/Appellants,

Appeal from the District of Maryland
Trial Court Judge: Honorable Richard D. Bennett
District Court Docket Number 06-CV-1389

CORRECTED BRIEF OF APPELLEE

Barley Snyder LLC
Sean E. Summers
100 East Market Street
P.O. Box 15012
York, PA 17405-7012
(717) 846-8888

Shumaker Williams PC
Craig T. Trebilcock
1 East Market Street
York, PA 17401
(717) 848-5134

Attorneys for Plaintiff/Appellee

### DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form need be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of all parties to a civil or bankruptcy case, corporate defendants in a criminal case, and corporate amici curiae. Counsel has a continuing duty to update this information.

No. __08-1026____ Caption: _____Albert Snyder v. Fred Phelps, Sr., et al._____

Pursuant to FRAP 26.1 and Local Rule 26.1,
_____Albert Snyder_____ who is _____Appellee_____,
(name of party/amicus)                              (appellant/appellee/amicus)
makes the following disclosure:

1. Is party/amicus a publicly held corporation or other publicly held entity?  NO

2. Does party/amicus have any parent corporations?   NO

If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    NO

If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   NO

If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)   NO

If yes, identify all members of the association, their parent corporations, and any publicly held companies that own 10% or more of a member's stock:

6. Does this case arise out of a bankruptcy proceeding?   NO

If yes, identify any trustee and the members of any creditors' committee:

_____s/ Sean E. Summers_____ _August 11, 2008_____

# TABLE OF CONTENTS

Corporate Disclosure Statement ............................................................ ii

Table of Authorities ............................................................................. v

I.   STATEMENT OF SUBJECT MATTER AND APPELLATE
     JURISDICTION ............................................................................. 1

II.  STATEMENT OF THE ISSUES ..................................................... 1

III. STATEMENT OF THE CASE .......................................................... 1

IV.  COUNTERSTATEMENT OF THE FACTS ................................... 2

V.   SUMMARY OF THE ARGUMENT ............................................. 8
     A.  The Defendants ...................................................................... 8
     B.  Amicus Curae .......................................................................... 8

VI.  ARGUMENT .................................................................................. 9
     A.  Standard of Review .............................................................. 9
     B.  Issue 1:  Personal jurisdiction was established. ................... 10
     C.  Issue 2:  Defendants are the only ones that attempted, albeit
         unsuccessfully, to litigate religious opinion ......................... 11
     D.  Issue 3:  Maryland (and all other jurisdictions) recognizes claims of
         Invasion of Privacy .............................................................. 13
     E.  Issue 4:  There is no public interest in a private funeral. ........... 17
     F.  Issue 5:  Plaintiff is not a public figure. ............................... 18
     G.  Issue 6:  Defendants acted with malice and caused severe and lasting
         damage .................................................................................. 19
     H.  Issue 7:  There is no evidence of passion or bias. .................. 19
     I.  Issue 8:  There were no evidentiary errors. ........................... 21
     J.  Issue 9:  All WBC members acted in agreement (conspired) to harm
         plaintiff. ............................................................................... 21
     K.  Issue 10:  The statutory cap does not apply to intentional torts ............... 21
     L.  Issue 11:  Defendants failed to meet their burden concerning a stay. ........ 22
     M.  The Thomas Jefferson Center for the Protection of Free Expression ........ 22

(i) Jury Instruction No. 21 was accurate as given, considering the facts of this case.  Alternatively, defendants waived any error because defendants requested the substance of this instruction ......................22

(ii) Jury Instruction No. 18 was appropriate based upon the facts of the case. ..................................................................................................24

(iii) There are no "chilling implications for freedom of speech." ..............26

(iv) The website cannot be considered in the abstract. ............................26

(v) Defendants committed the tort of Intentional Infliction of Emotional Distress. ...................................................................................................27

(vi) There is no public policy reason for this Court to save these particular defendants.........................................................................................27

N.  American Civil Liberties Union.................................................................28

(i) There is no matter of public concern..................................................28

(ii) The jury only considered the signs that targeted the Snyder family...31

VII. CONCLUSION ...............................................................................................32

# TABLE OF AUTHORITIES

## Cases

*Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F. 3d 390 (4th Cir. 2003).................................................................................11

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ..12

*Cole v. Sullivan*, 676 A. 2d 85 (Md. Ct. Spec. App. 1996) ....................................21

*Dixon v. Edwards*, 290 F. 3d 699, 714 (4th Cir. 2002) ...........................................12

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985)....29

*Evans v. Eaton Corp. Long Term Disability Plan*, 514 F. 3d 315, 320-321 (4th Cir. 2008)..................................................................................9

*Hill v. Colorado*, 530 U.S. 703, 716-717 (2000) ...................................................16

*Hustler Magazine v. Falwell*, 485 U.S. 46 (1988).......................................... 22, 23

*In re Westboro Baptist Church*, WL 2852784 at 4, (Kan.App. 2008).....................24

*Kirby v. City of Elizabeth City, N.C.*, 388 F. 3d 440 (4th Cir. 2004) .....................30

*McQueary v. Stumbo*, 453 F. Supp. 2d 975 (E.D. Ky. 2006) ..................................16

*National Archives and Records Administration v. Favish*, 541 U.S. 157 (2003)....14

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)........................ 18, 19, 23, 24

*Phelps-Roper v. Nixon*, 509 F. 3d 480 (8th Cir. 2008)...........................................14

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) .....................................................23

*Schuyler v. Curtis*, 147 N.Y. 434, 42 N.E. 22, 25 (1895)......................................14

*Snyder v. Phelps*, 533 F.Supp.2d 567 (D.Md. 2008) ................................. 24, 27, 32

*Taylor v. Local No. 7*, 353 F.2d 593, 601 (C.A. Md. 1965)....................................10

*Tierco Md., Inc. v. Williams*, 381 Md. 378, 849 A.2d 504, 526 n. 29 (2004) .........19

*United States v. Cooper*, 482 F. 3d (4th Cir. 2007) ................................................21

*United States v. Sanchez*, 118 F.3d 192, 195 (4th Cir.1997)..................................10

## Statutes

28 U.S.C. § 1292...........................................................................................1

28 U.S.C. § 1332...........................................................................................1

## I.     STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The district court properly exercised jurisdiction pursuant to 28 U.S.C. § 1332.  This Court has jurisdiction pursuant to 28 U.S.C. § 1292.

## II.     STATEMENT OF THE ISSUES

Defendants have unnecessarily complicated the issues.  From plaintiff's standpoint, there is only one issue, and consequently, plaintiff will not re-state defendants' purported issues.

**Issue:**  Is defendants' conspiracy to commit an intentional tort against a private grieving father of a deceased Marine protected by the First Amendment?

**Suggested Answer:**  *In the negative.*

## III.     STATEMENT OF THE CASE

On June 5, 2006, plaintiff filed a Complaint against defendants Fred Phelps, Sr. ("Phelps") and Westboro Baptist Church, Inc. ("WBC") alleging (1) Defamation, (2) Invasion of Privacy - Intrusion Upon Seclusion, (3) Invasion of Privacy - Publicity Given to Private Life, (4) Intentional Infliction of Emotional Distress, and (5) Civil Conspiracy.  Phelps and WBC filed a Motion to Dismiss on September 18, 2006, which was subsequently denied.  Thereafter, plaintiff filed an Amended Complaint adding defendants Shirley Phelps-Roper ("Roper") and Rebekah Phelps-Davis ("Davis") as defendants.  Roper and Davis also filed a

Motion to Dismiss on April 24, 2007, which was similarly denied on June 4, 2007.

On September 4, 2007, defendants filed a Motion for Summary Judgment, which

was denied in part and granted in part.  In short, the district court granted

defendants' Motion for Summary Judgment concerning Count I (Defamation) and

Count III (Invasion of Privacy - Publicity Given to Private Life./)

A jury trial began on October 22, 2007.  On October 31, 2007, a jury

returned a verdict in favor of plaintiff.  The jury awarded plaintiff $2.9 million in

compensatory damages and $8 million in punitive damages.  Thereafter,

defendants filed post-trial motions.  The district court reduced the punitive damage

award to $2.1 million but allowed the jury's verdict to stand concerning all other

respects.  Subsequently, defendants filed the within appeal.

## IV.    COUNTERSTATEMENT OF THE FACTS

After high school, Lance Corporal Matthew Snyder fulfilled a life-long

dream and enlisted in the United States Marine Corps.  (Vol. VIII, 2063)  On

March 3, 2006, plaintiff Albert Snyder ("Snyder") learned that his only son was

killed in Al Anbar Province, Iraq.  (Vol. VII, 2064)  The Snyder family planned a

traditional burial service at their family church, St. John's Catholic Church in

Westminster, Maryland, scheduled for March 10, 2006.  (Vol. VII, 2065, 2083)

On March 8, 2006, Matthew's body arrived in the states, and defendants

2

simultaneously announced their intent to protest.[1]  (Vol. VIII, 2156, 2195)  Two

viewings were held.  First, a viewing was held on March 9, 2006 in the evening for

friends and extended family.  Second, a viewing was held for immediate family

and a few friends just prior to the funeral on March 10, 2006.  On the day of the

funeral, Snyder knew that defendants would be present but Snyder, however,

attempted to focus on his son and concentrated on putting defendants out of his

mind.

Defendants staged their protest across the street from a public school.  (Vol.

VIII, 2242)  Defendants were directly in front of the St. John's Catholic elementary

school.  (Vol. VIII, 2249)  To mitigate the harm to the children, parents were given

the option of having excused absences so that the children were not victimized

further by defendants' presence and activities.  (Vol. VIII, 2249)

During the funeral procession, defendants were 200-300 feet from Snyder.

(Vol. VII, 2079)  Unsurprisingly, defendants' presence turned the funeral into a

circus.  (Vol. VII, 2082)  Defendants' presence eliminated the "peaceful

experience for [St. John's] school or the community."  (Vol. VIII, 2251)

---

[1] The word protest has been loosely used throughout this case by defendants and creates the connotation that defendants were picketing an issue of public concern related to the war.  It would be more appropriate to describe their actions as the "celebration" of a young soldier's death, as they were not protesting the war or any other issue of public concern.  However, for ease of reference in this brief, plaintiff will use the word "protest."

Obviously, defendants were not invited to the funeral.  (Vol. VII, 2084)  Because of defendants' presence, the funeral procession had to be re-routed.[2]  (Vol. VIII, 2244)  According to *defendants' expert*, defendants were a "petty irritant."  (Vol. X, 2571)

Defendants brought various signs with them to Westminster, Maryland to protest Matthew's funeral.  One of the signs was "Thank God for Dead Soldiers."  That particular sign was directed at the Snyder family and defendants were "thanking God [Snyder's] son was dead."  (Vol. VIII, 2113)  Additionally, defendants challenged Snyder's religion at a particularly vulnerable moment.  Another one of defendants' signs is styled as "Priest Rape Boys" which targeted Snyder's religion.  (Vol. VIII, 2115)  "You're Going to Hell" is another sign that particularly hurt Snyder.  (Vol. VIII, 2119)  The "Fag Troops" sign was brought to Matthew's funeral because Matthew was a Marine.  Consequently, defendants were calling Matthew a fag as his father was burying him.  (Vol. VIII, 2120)  Disgustingly, defendants brought a sign to the funeral  with a picture of two males performing anal sexual intercourse.  (Vol. VIII, 2203)  Even Phelps admits that grieving family members would be offended by the sign containing males performing anal sexual intercourse.  (Vol. VIII, 2205)

---

[2] The funeral procession had to be re-routed because defendants were several feet from the main entrance of the church.

According to *defendants' expert*, defendants' signs were "personal" to the Snyder family.  (Vol. X, 2572)  When discussing the "Thank God for Dead Soldiers" sign, *defendants' expert* stated that "I think that goes a little bit further than protesting against a war."  (Vol. X, 2572)  *Defendants' expert* further explained the consequences of defendants' actions in regard to plaintiff's depression.  "[I]t intered with the process that we go through of honoring our soldiers who die for their country and also could have surely interfered with the grieving process and allowing him to be a hero without any tarnish on his casket."  (Vol. X, 2578)  In other words, defendants' own evidence conceded that defendants' actions tarnished the funeral and harmed Snyder.

Phelps explained his motive concerning protesting military funerals.  In short, the motive is revenge.  Approximately three years before trial, members of WBC were assaulted by Marines, at least according to Phelps.  (Vol. VIII, 2226)  In retaliation, WBC members began to protest military funerals and have continuously terrorized grieving military families since the alleged assault.  For example, defendants sign movies replicate their protest of Lance Corporal Matthew Snyder's funeral.  (Vol. VIII, 2216; *see* Sign Movies at Defendants' Trial Exhibits, 41a-f.)

Further, it was defendants' stated goal to "place a little bug in" in Snyder's head.  (Vol. VIII, 2111-2112)  It goes without saying that none of the defendants knew anyone in the Snyder family and no one in the Snyder family knew anyone in defendants' family.  Phelps knew that the events of March 10, 2006 were tantamount to "pouring salt into the wound."  (Vol. VIII, 2237)  Even though it was defendants' intention to "place a bug" in Snyder's head, defendants knew that they were not welcome at the funeral.  (Vol. VIII, 2206)

Defendants know that their presence at funerals creates a credible threat of violence.  (Vol. XIV, 3776)  In this regard, the police agreed with defendants that their presence created a credible threat of violence and law enforcement acted in accordance with that threat.  (Vol. VIII, 2268)  The police deployed the local S.W.A.T. team based on the agreed upon threat of violence.  (Vol. VIII, 2271) Further, state, county and local police collaborated to control potential violence. (Vol. VIII, 2272)  There was a command and control unit in the form of a Winnebago on the scene to control the various law enforcement agencies.  (Vol. VIII, 2274)  For the sole purpose of protecting defendants, five sheriffs in five patrol cars escorted defendants to the church.  (Vol. VIII, 2284)  Defendants' presence did, in fact, invoke violence but fortunately the police were able to subdue the potential violence before any injuries occurred.  (Vol. VIII, 2287)

Subsequent to defendants' actions, Snyder would cry and vomit and he will never have peace.  (Vol. VIII, 2130-2131)  On the way to the funeral from the viewing, Snyder looked at his daughters and saw defendants' signs behind his daughters.  (Vol. VIII, 2144)  Again, this is a time when Snyder was attempting to concentrate on his son.  It also follows that Snyder was injured by watching his living children see the consequences of the protest.  Because of defendants' actions, Snyder's depression and diabetes has worsened.  (Vol. VIII, 2145)  When Snyder attempts to think of his son's funeral, "it always turns into the bad."  (Vol. VIII, 2139)  From a completely physical standpoint, defendants' actions exacerbated Snyder's diabetes.  (Vol. VIII, 2145)

Funerals have a therapeutic value that is very strong.  (Vol. XI, 2728)  More specific to Matthew's death, funerals have more of a significance to sudden deaths because there is not time to say goodbye to the deceased when the death was unexpected.  (Vol. XI, 2730)  Further, military funerals are particularly helpful to the grieving family and provide a "meaningful part of the ceremony."  (Vol. XI, 2731)  Defendants and the rest of the WBC members are the only individuals to protest funerals, throughout all of time.  (Vol. XI, 2732)  All witnesses and experts agree that Phelps and his followers (his family members) are the only people in recorded history to target funerals.

During a funeral, grieving families rely upon their faith and a challenge to that faith causes complications in the grieving process.  (Vol. XI, 2733)  Put differently, defendants' actions made Snyder's grief worse.  (Vol. XI, 2734)  In addition, the grieving process is not limited to one moment in time and must be taken as a whole process over time.  (Vol. XI, 2741)  When defendants disrupted Matthew's funeral, defendants complicated Snyder's grieving process - they made it worse.  (Vol. XI, 2742)

## V.    SUMMARY OF THE ARGUMENT

### A.    The Defendants

Defendants have essentially conceded that they committed the torts of invasion of privacy, intentional infliction of emotional distress and civil conspiracy.  However, defendants mistakenly treat Snyder as the *government* to support their position.   Further, defendants fail to show any deference towards the trier of fact.

### B.    Amicus Curae

There is no Constitutional crisis.  Simply put, private individuals and a private entity committed several intentional torts, and consequently, a jury found the culpable parties liable for damages.  All of the hypothetical scenarios presented by amici are unfounded based upon the facts of this particular case.

Every trier of fact that has observed these particular defendants has concluded that "[t]he words *and the activity* conveying the words is equivalent to an immediate invasion of privacy and an assault." *Westboro Baptist Church, Inc. et al., v. City of Topeka et al.*, at 72 Supplemental Appendix, p. 72. (emphasis added.) Stated differently, it is not just defendants words but rather the totality of the circumstances that resulted in their liability. Additionally, there is, curiously, an unwillingness to recognize that Mr. Snyder has a right to peacefully assemble. Finally, defendants targeted the Snyder family and it is inconceivable to think that targeting a grieving family is a matter of "public concern."

## VI.    ARGUMENT

### A.    Standard of Review

The purpose of standards of review is to focus reviewing courts upon their proper role when passing on the conduct of other decision-makers. Standards of review are thus an elemental expression of judicial restraint, which, in their deferential varieties, safeguard the superior vantage points of those entrusted with primary decisional responsibility. *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F. 3d 315, 320-321 (4th Cir. 2008) (Internal citations omitted.) The clear error standard, for example, protects district courts' primacy as triers of fact. *Id.* This Court is "not unmindful of the rule that erroneous conclusions of law may

always be set aside while findings of fact, to be rejected on appeal, must be 'clearly

erroneous' and that a finding of fact is clearly erroneous when, although there is

evidence to support it, the reviewing court is left with a definite and firm

conviction that a mistake has been committed." *Taylor v. Local No. 7*, 353 F.2d

593, 601 (C.A. Md. 1965) (Internal citations omitted.)  A district court's

evidentiary rulings are reviewed under the narrow abuse of discretion standard. *See*

*United States v. Sanchez*, 118 F.3d 192, 195 (4th Cir.1997).

B.    Issue 1: Personal jurisdiction was established.[3]

The district court properly exercised personal jurisdiction, notwithstanding

defendants confusion concerning general and specific jurisdiction.  Specifically,

the district court correctly concluded that plaintiff established specific jurisdiction.

Defendants traveled from Kansas to Maryland for the express purpose of picketing

Lance Corporal Matthew Snyder's funeral in Westminster, Maryland.  For their

own protection, defendants requested and received Maryland law enforcement

protection from state, county and local agencies.  (Vol. XIV, 3776)  Additionally,

defendants received the benefits of local fire and ambulance personnel that were

present in Westminster, Maryland, in the vicinity of St. John's Catholic Church,

entirely because of defendants' presence.  Tellingly, defendants wish to reap the

---

[3] For this Court's ease of reference, plaintiff will identify topics in accordance with defendants alleged issues.

10

benefits of Maryland's laws but are attempting to avoid the consequences of their actions in Maryland.

The facts forming the basis of the allegations in plaintiff's complaint involve defendants' physical presence in Maryland. Defendants furthered their tortious activity on the internet, subsequent to their misconduct in Maryland. *See, e.g., Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F. 3d 390 (4th Cir. 2003). In sum, plaintiff established specific personal jurisdiction.

C.     Issue 2:  Defendants are the only ones that attempted, albeit unsuccessfully, to litigate religious opinion.

Despite defendants' attempts to litigate their religious opinion, the jury was never instructed to decide any issues concerning religion. As defendants have conceded, *their own expert* stated that there is no connection to defendants' religion and protesting soldiers' funerals. In other words, according to defendants' *own expert*, there is no religious significance to defendants' actions as it relates to their religion. Further, defendants were told years ago that their actions had no religious consequence.

> Here, plaintiffs contend the picketing of funerals is motivated by their religious beliefs and in furtherance of their religious obligation to go forth and warn the citizenry of the risks of defying what they believe is God's word condemning homosexuality. While it is correct, as fact, that the plaintiffs' personal religious beliefs proscribe any sympathetic tolerance to homosexuality, and correct, as fact, that preaching their beliefs and carrying forth a public warning is part of their religious

> tenets and training, nevertheless, the particular means by which they carry forth their message is one of personal preference not one of religious mandate. The complete elimination of this particular forum, much less a time, place, and manner restriction regarding it, does not disable their religious regimen from exercise in other public forums or by other means to disseminate and "preach" their position that God does not tolerate homosexuals. **There is no religious consequence imposed for failing to picket at a specific location or event.**

*Westboro Baptist Church, Inc. et al., v. City of Topeka et al.*, at 75-76

Supplemental Appendix pp. 75-76. (Emphasis added)

Concerns regarding defendants' religious viewpoint is a red herring that should be summarily dismissed. "When a civil dispute merely involves a church as a party, however, and when it can be decided without resolving an ecclesiastical controversy, a civil court may properly exercise jurisdiction." *Dixon v. Edwards*, 290 F. 3d 699, 714 (4th Cir. 2002).

Ironically, defendants' actions disrupted plaintiff's religious service. St. John's Catholic Church is, indeed, a Catholic church. The Snyder family is Catholic and conducted a Catholic funeral and mass on March 10, 2006. Defendants have utterly failed to provide any legal support for their position. In, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), a city council enacted a law. In the instant matter, a private party sued other private parties for defendants' tortious activities.

If defendants' logic were followed, defendants would have this Court choose defendants' religion over plaintiff's religion. It was defendants that traveled from Kansas to Maryland for the express purpose of picketing plaintiff's religious activity -- i.e., his son's burial at his Catholic church.

D.    Issue 3: Maryland (and all other jurisdictions) recognizes claims of Invasion of Privacy.

Maryland recognizes a cause of action for invasion of privacy to protect its citizens. Notably, defendants' purported legal support for their position concerns statutory language or equitable relief regarding a government entity or statute.

Defendants learned years ago that their actions invaded others' privacy. "The words and the activity conveying the words is equivalent to an immediate invasion of privacy and an assault." *Westboro Baptist Church, Inc. et al., v. City of Topeka et al.*, at 72 Supplemental Appendix, p. 72.

"It is the right of privacy of the living which it is sought to enforce here. That right may in some cases be itself violated by improperly interfering with the character or memory of the deceased relative, but it is the right of the living, and not that of the dead, which is recognized. A privilege may be given the surviving relatives of a deceased person to protect this memory, but the privilege exists for the benefit of the living, to protect their feelings, and to prevent a violation of their

13

own rights in the character and memory of the deceased." *Schuyler v. Curtis*, 147 N.Y. 434, 42 N.E. 22, 25 (1895).

Unsurprisingly, defendants attempt to distinguish *National Archives and Records Administration v. Favish*, 541 U.S. 157 (2003).[4] Assuming *arguendo* that the Supreme Court did not, *per se*, establish a privacy right in a funeral, the Supreme Court did recognize that "[f]amily members have personal stake in honoring and mourning their dead and objecting to unwanted public exploitation that, by intruding upon their own grief, tends to degrade the rites and respect they seek to accord the deceased person who was once their own." *Id.* at 168.

Defendants attempt to muster some support for their position by relying upon Roper's challenge of a Missouri statute, in *Phelps-Roper v. Nixon*, 509 F. 3d 480 (8th Cir. 2008). Importantly, *Phelps-Roper* concerns a private party challenging an alleged overbroad statute and not a tort committed by one private party against another. Furthermore, in *Phelps-Roper*, the Eighth Circuit involved supposed "peaceful picketing." *Id.* at 484. Where, as here, defendants

---

[4] Defendants' reliance upon *Showler v. Harper's Magazine Foundation*, 2007 WL 867188 (10th Cir., 3/23/07), *cert. denied*, 128 S.Ct. 196, 169 L.Ed.2d 37 (2007), is equally unavailing. In *Showler*, a photographer photographed a deceased soldier. However, the photographer did not disrupt and disturb the funeral process itself. The cause of action was based entirely upon a subsequent publication of a photograph and not the actions at the funeral. Further, the photographer was present at the funeral with permission from the family. Simply put, the court concluded "that Defendant's actions did not rise to the level of extreme and outrageous conduct." *Id* at 4. In the instant matter, even defendants conceded that their conduct at the funeral was extreme and outrageous.

14

acknowledge that their activities will elicit violence, there is no "peaceful picketing." Defendants expressly acknowledge that their presence in Westminster, Maryland "will not be well received by some factions of our society, and our experience over the years indicates that sometimes people who oppose our message are tempted to try violence to silence it." (Vol. XIV, 3776; *see*, *also*, Defendants' Trial Exhibit 41e, titled "God Hates You," for an example of the violence that is associated with defendants' presence.)

Assuming, *arguendo*, that this Court finds any merit to defendants' argument, the Supreme Court has realized that all listeners are not equal.[5] "The unwilling listener's interest in avoiding unwanted communication has been repeatedly identified in our cases. It is an aspect of the broader "right to be let alone" that one of our wisest Justices characterized as "the most comprehensive of

---

[5] This Court need not reach the broad constitutional arguments that defendants seek to raise in this case. Contrary to their arguments, the facts show this was not an isolated protest warranting constitutional protection of free speech. The facts show, and the jury found, that this was a carefully coordinated and ongoing pattern of conduct by a Kansas family to intentionally lash out at a private grieving military family from Maryland. The attacks began with a press release containing the deceased Marine's picture that described his funeral mass as occurring at a "Catholic dog kennel." It continued with the celebration of his death at the church on March 10th with the personally targeted signs described above. The private nature of the ongoing tort was finally and fully revealed in the internet posted "epic" in which Roper attacked the Snyder family subsequent to the funeral as not loving their child, raising him for the devil, and stating the most vile and harmful statements a parent could ever be expected to endure about the love for their child. Whether or not a protest at a funeral conducted in isolation from other tortious acts may merit First Amendment protection in a given case need not be reached by this Court. Taken together, the protracted and repeated verbal assaults and actions of the defendants in this case against a private grieving father merit upholding Maryland's protections of its citizens from a conspiracy to inflict emotional distress and invade privacy.

rights and the right most valued by civilized men." *Hill v. Colorado*, 530 U.S. 703, 716-717 (2000) (internal citations and footnotes omitted.) "The right to avoid unwelcome speech has special force in the privacy of the home, and its immediate surroundings, but can also be protected in confrontational settings." *Id.* (Internal citations omitted.) "[T]he First Amendment does not demand that patients at a medical facility undertake Herculean efforts to escape the cacophony of political interests." *Hill*, 530 U.S. at 716. Likewise, mourners (to include plaintiff) should not be required to undertake Herculean efforts to escape defendants' disruptive behavior -- especially when plaintiff is burying his own son -- again, a civilized society requires a right to privacy.

Applying simple common sense, in *McQueary v. Stumbo*, 453 F. Supp. 2d 975 (E.D. Ky. 2006), the court concluded that,

> [a] funeral is a deeply personal, emotional and solemn occasion. Its attendees have an interest in avoiding unwanted, obtrusive communications which is at least similar to a person's interest in avoiding such communications inside his home. Further, like medical patients entering a medical facility, funeral attendees are captive. If they want to take part in an event memorializing the deceased, they must go to the place designated for the memorial event.

*Id.* at 992. Defendants' attempt to characterize plaintiff as a government actor is misplaced and not supported by the facts of the case or supporting legal authority.

16

E.    Issue 4:  There is no public interest in a private funeral.

Plaintiff attempted to bury his son in a <u>private</u> and dignified manner.[6]  (Vol. VIII, 2247)  However, defendants turned plaintiff's one and only opportunity to bury his son into a circus.  (Vol. VII, 2082)  More specifically, plaintiff requested a private funeral and requested that media be denied access.  Defendants concede that Snyder cannot change public policy, which contravenes their "public concern" argument.  (Vol. VIII, 2210)  It follows that the only reason to protest a private military funeral is to command a captive audience that is not otherwise available.

Defendants' words are not matters of public concern.  Specifically, defendants targeted plaintiff (and his family and deceased son) by proclaiming that "You're Going to Hell," "God Hates You," "Thank God for Dead Soldiers," "Semper Fi Fags," and "Thank God for IEDs."  The district court correctly determined that these signs were not matters of public concern.  However, the district court went one step further for the benefit of defendants.  Instead of instructing the jury that the aforementioned signs were not matters of public concern, the court required plaintiff to prove that the signs were not matters of public concern even though the district court already concluded that the signs were

---

[6] Defendants only evidentiary support for their story that the funeral was even remotely public was the fact that a standard obituary was published in the local newspapers.  Rightfully so, the district court and jury rejected this absurd contention.

17

not matters of public concern.  Plaintiff concurred in the court's logic and specifically discussed the "You're Going to Hell" and "Semper Fi Fags" signs. (Vol. VII, 2086-2087)  On the other hand, plaintiff was not offended by the signs that were not directed at his family or religion and were generally regarding the United States.  (Vol. VIII, 2116-2117)

Defendants' contend: "The record shows clearly that every fact defendants addressed about plaintiff or his son, plaintiff published."  Defendants Brief at 17-18.  This incredible statement belies the evidence, especially if the fact finder is given any deference whatsoever.  The offending statements concerning Lance Corporal Matthew Snyder going to hell, god hating him, being homosexual or celebrating his death (i.e., Thank God for Dead Soldiers) were not published by plaintiff.

F.      Issue 5:  Plaintiff is not a public figure.

Next, defendants argue that *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), should apply to a lawsuit by and between two private parties.  "The constitutional guarantees require, we think, a federal rule that prohibits a **public official** from recovering damages for a defamatory falsehood relating to his **official conduct** unless he proves that the statement was made with 'actual malice'-that is, with knowledge that it was false or with reckless disregard of whether it was false

or not." *Id.* at 279-280 (emphasis added). There is an understandable reason that public officials must meet a different burden. "Such a privilege for criticism of official conduct is appropriately analogous to the protection accorded a public official when he is sued for libel by a private citizen." *Id.* at 282. Consequently, the Supreme Court held "that the Constitution delimits a State's power to award damages for libel in actions brought by *public officials* against critics of their *official conduct*. Since this is such an action, the rule requiring proof of actual malice is applicable." *Id.* at 283. Snyder is not a public official and was not acting pursuant to official conduct. In any event, Snyder did prove actual malice.

G.    Issue 6: Defendants acted with malice and caused severe and lasting damage.

Defendants acted with malice and, respectfully, this Court should not substitute its judgment for the judgment of the jury or district court -- both of which, watched the witnesses testify. The jury was properly instructed on malice, *see Tierco Md., Inc. v. Williams*, 381 Md. 378, 849 A.2d 504, 526 n. 29 (2004), and defendants do not agree with the trier of fact.

H.    Issue 7: There is no evidence of passion or bias.

Any concerns regarding "passion" or "bias" are speculative, at best. The district court did nothing improper. At most, the district court became understandably frustrated with defendants repeatedly raising the same objections,

19

some of which were frivolous. If defendants were concerned with juror 13, defendants could have simply used their peremptory challenge to dispose of any purported concern. There is no evidence, beyond mere speculation, that juror 13 did anything improper. Speculation is no reason to presume bias.

Incredibly, defendants complain about the sign movies. ***In other words, defendants are complaining about their own exhibits.*** The closing arguments were made based upon a fair characterization of the evidence and the jury instructions provided by the court. Objections, if any, were appropriately ruled upon. Alternatively, any objections not made were waived.

The district court did, in fact, place a time limit on Roper's repetitive arguments and occasionally referred to Roper's dialogue as rambling during oral argument. The district court must be given some discretion concerning placing reasonable time limits on Roper. Otherwise, there was no end in sight.

Unsurprisingly, plaintiff was disturbed when the sign movies were being played and asked to be excused from the courtroom. Indeed, it is difficult for any person to watch the sign movies and not be disturbed. *See* Defendants' Trial Exhibits, 41a-f. Apparently, the fact that the district court has seen a Bible before is prejudicial, at least according to defendants. In any event, defendants'

speculation concerning prejudice presumes that the district court has no discretion and that the jury completely ignored the jury instructions.

I.     Issue 8:  There were no evidentiary errors.

There were no prejudicial evidentiary issues and defendants vague or ambiguous concerns are of no moment.  Nevertheless, evidentiary issues are reviewed for an abuse of discretion.  *United States v. Cooper*, 482 F. 3d (4th Cir. 2007).  Alternatively, any evidentiary issues are harmless errors.  Defendants have failed to carry their burden establishing an abuse of discretion.

J.     Issue 9:  All WBC members acted in agreement (conspired) to harm plaintiff.

Defendants attempt to escape liability for their actions by claiming that they are agents of the corporation.  However, at trial, defendants were adamant that they paid for their own travel and acted on their own behalf.  Further, defendants, in closing argument, conceded a conspiracy and argued that they did not commit the underlying torts, albeit unsuccessfully.

K.     Issue 10:  The statutory cap does not apply to intentional torts.

There is no basis for this Court to overrule *Cole v. Sullivan*, 676 A. 2d 85 (Md. Ct. Spec. App. 1996), and no reason to believe that Maryland's highest court would overrule *Cole*.

21

L.    Issue 11:  Defendants failed to meet their burden concerning a stay.

A stay was properly denied by the district court and by this Court (on two occasions).

M.    The Thomas Jefferson Center for the Protection of Free Expression.

(i)    Jury Instruction No. 21 was accurate as given, considering the facts of this case.  Alternatively, defendants waived any error because defendants requested the substance of this instruction.

Reliance upon *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988), is misplaced.  First, Falwell was "a nationally known minister who has been active as a commentator on politics and public affairs . . .."  On the other hand, plaintiff Snyder is a private individual that comments on nothing.  The issue that *Hustler Magazine* presented to our Supreme Court was clear.  "We must decide whether a **public figure** may recover damages for emotional harm caused by the publication of an ad parody offensive to him, and doubtless gross and repugnant in the eyes of most."  *Id*. at 50. (Emphasis added.)  Plaintiff Snyder (or anyone else in the Snyder family) is not a public figure.  Finally, the holding of Hustler Magazine is unequivocal.  "We conclude that **public figures** and **public officials** may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with "actual

22

malice," i.e., with knowledge that the statement was false or with reckless disregard as to whether or not it was true." *Id*. at 56. (Emphasis added.) Again, plaintiff Snyder is not a public figure or public officicial.

Next, *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) is equally unavailing and underscores the weakness of the argument. City of St. Paul is, in fact, a city -- i.e., the government. Nevertheless, even defendants admit that their signs are obscene. Defendants' presence invoked "fighting words" - not theoretically, but real. (Vol. XIV, 2776; Vol. VIII, 2268) Additionally, defendants and law enforcement were so convinced that there was a threat of violence that enough police protection was engaged to protect a dignitary. (Vol. VIII, 2268-2274, 2284) Simply put, even assuming *arguendo* that plaintiff Snyder is the government - which would be wrong to begin with - there is no basis to heighten any scrutiny based upon the facts of this case.

Similar to *Hustler Magazine*, reliance on *Times v. Sullivan*, 376 U.S. 254 (1964) misses the mark. "The question before us is whether this rule of liability, as applied to an action brought by a *public official* against critics of his *official conduct*, abridges the freedom of speech and of the press that is guaranteed by the First and Fourteenth Amendments." *Id*. at 268. (emphasis added.) "We hold today that the Constitution delimits a State's power to award damages for libel in actions

23

brought by *public officials* against critics of their *official conduct*. Since this is

such an action, the rule requiring proof of actual malice is applicable." *Id*. at 283.

(emphasis added.)  Reliance on cases concerning *public officials* acting in *official*

*conduct* is tantamount to comparing apples and oranges, at best.

        (ii)    Jury Instruction No. 18 was appropriate based upon the facts of
               the case.

There was no "matter of public significance" in a private funeral.  The

district court correctly concluded that "[d]efendants cannot by their own actions

transform a private funeral into a public event and then bootstrap their position by

arguing that Matthew Snyder was a public figure." *Snyder v. Phelps*, 533 F. Supp.

2d 567, 577 (D. Md. 2008).  Defendants cannot turn a private funeral into a "matter

of public significance" by "creat[ing] an atmosphere of confrontation. This

atmosphere was created by signs carrying both a general message as well as signs

that could reasonably be interpreted as being directed at the Snyder family." *Id*.

There is ample evidence that the funeral goers saw defendants' signs and the

targets of those signs were the Snyder family.  (*See* Counterstatement of the Facts)

Indeed, it is defendants *modus operandi* to target families and they, unfortunately,

succeeded when they targeted Snyder.  "WBC member Shirley Phelps-Roper

described the process for creating a sign and selecting a picketing **target**." *In re*

*Westboro Baptist Church*, WL 2852784 at 4, (Kan.App. 2008) (emphasis added.)

24

Again, unless this Honorable Court chooses to be a factfinder, the jury and district court should be given *some* deference.

Defendants and amicus reveal the weakness in their argument when incorrect facts are stated. For example, when there is a suggestion that there was a "non-disruptive" protest, the argument is premised upon incorrect facts.[7] Tellingly, it is <u>conceded</u> that "it would have been reasonable to consider an intrusion claim had there been an actual disruption of the funeral service."[8] In addition, it is also conceded, curiously, that there could be an intrusion if the same events happened "outside of Mr. Snyder's house."[9] Although Mr. Snyder was not given the choice, it is fair and reasonable to assume that he would have chosen to have defendants outside his house on a random day rather than at his only son's funeral, at his chosen place of religion and with his entire family and community attempting to grieve. It follows that if being outside a residence can be an intrusion than being outside a funeral and disrupting a funeral can also be an intrusion. Any other conclusion defies common sense and decency.

---

[7] *See* The Thomas Jefferson Center for the Protection of Free Expression Brief at 21.
[8] *See* The Thomas Jefferson Center for the Protection of Free Expression Brief at 22.
[9] *See* The Thomas Jefferson Center for the Protection of Free Expression Brief at 22.

(iii)    There are no "chilling implications for freedom of speech."

Once the Court gets beyond all of the hypothetical scenarios that do not apply to the facts of the instant matter, any "chilling" concerns can easily be dismissed.  Taken to the logical conclusion, the following will occur if the verdict is upheld based upon the facts of this case.  70 family members from Topeka, Kansas will be financially responsible for terrorizing a grieving family.  According to defendants, there is no religious consequence for protesting funerals.  Defendants (and all others) can protest nearly anywhere.  Throughout all of time, no one has targeted funerals in the manner that these defendants do.  It follows that if these defendants are held financially liable for terrorizing a grieving family there will be no Constitutional crisis and the First Amendment will survive.

(iv)    The website cannot be considered in the abstract.

Defendants' actions started when they sent their "News Release" to various entities in Maryland.  (Supplemental Appendix, p. 158a)  Next, defendants brought their circus-like behavior to St. John's Catholic Church and disrupted a private funeral.  Any attempt to segregate the facts and require each element of a tort to be proven for each different factual occasion defies the reality of trials.  Furthermore, defendants and amicus speculate that the jury did not follow the district court's instructions.

(v)     Defendants committed the tort of Intentional Infliction of
        Emotional Distress.

Again, it is necessary to look beyond hypothetical scenarios and focus on the

facts of the instant matter.  Unless this Court is going to disbelieve plaintiff and his

priest, the funeral was disrupted.  The service was disrupted when the procession

was re-routed.  When Snyder was attempting to grieve his deceased son and

simultaneously worrying about his living daughters observing defendants, the

grieving process was disrupted.  In addition, the signs and actions were focused

towards the Snyder family.  As the district court concluded, "these additional signs,

which could be interpreted as being directed at the Snyder family, created issues

for the finder of fact."  *Snyder*, 533 F. Supp. 2d at 578.  Even defendants admit that

the signs were chosen based upon the target.

(vi)    There is no public policy reason for this Court to save these
        particular defendants.

It seems obvious that a civilized society would allow grieving family

members to bury deceased children in peace and without disruption.  Any

theoretical distinctions made in favor of these defendants would necessarily ignore

the reality of the situation.  The suggestion that there are other means to protect

grieving families requires a journey into theory as opposed to reality.  Defendants

have repeatedly claimed that no laws will stop their terror activities.  States, such

27

as Maryland, should be allowed to protect their citizens.  To suggest that anything

defendants did was "respectful,"[10] would fail to pass the straight-face test and

underscores the need for Maryland to protect grieving families.

    N.    American Civil Liberties Union

    Similar to defendants and other amicus, the ACLU misstates the facts.  For

example, defendants did not carry the same signs to Matthew's funeral as they did

to the Maryland legislature and Naval Academy.[11]  To the contrary, defendants

switched or added signs to target the Snyder family.  Specifically, defendants

changed their Navy related signs and used Marine related signs - i.e., Sempri Fi

Fags - because Matthew was a Marine.  Additionally, defendants utilized the signs

that target the Catholic religion - i.e., the Snyder family's religion.

    Any claim that Phelps' protests military funerals to publicize his message

implicitly ignores Phelps' stated purpose to retaliate against Marines for an alleged

assault.  Plaintiff Snyder, contrary to the assertions in the ACLU brief, did know of

defendants' presence at his son's funeral.

    (i)    There is no matter of public concern.

    Notably, defendants were found liable based upon the totality of the

circumstances rather than just the content of their speech -- as the ACLU contends.

---

[10] *See* The Thomas Jefferson Center for the Protection of Free Expression Brief at 31.
[11] *See* The American Civil Liberties Union Brief at 4.

The jury and district court observed defendants' actions and words.  Judge Theis saw defendants' actions and words.  *See Westboro Baptist Church, Inc. et al., v. City of Topeka et al.*

Nevertheless, whether "speech addresses a matter of public concern must be determined by [the expression's] content, form, and context ... as revealed by the whole record."  *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985)(internal citations omitted.).  In other words, the district court must be required to look at the totality of the circumstances.  Further, when deciding whether speech is a matter of public concern, courts determine whether "debate on public issues [will] be uninhibited, robust, and wide-open."  472 U.S. at 762 (internal citations omitted.).

With this background, defendants stood outside plaintiff's son's funeral and told plaintiff that his son was going to hell.  In addition, defendants disparaged plaintiff's religion as he was grieving and burying his son.  By means of example, defendants claimed that "Priest Rape Boys" and stated "Pope in Hell."  No civilized society expects debate concerning "Priest Rape Boys" at a Catholic funeral.  Since Matthew was a Marine, defendants proclaimed "Sempri Fi Fags" at Matthew's funeral.  It is difficult to fathom that debating Matthew's sexual orientation at his funeral is a matter of public concern.

29

The ACLU's reliance on *Kirby v. City of Elizabeth City, N.C.*, 388 F. 3d 440 (4th Cir. 2004), highlights many weaknesses in their argument. First, there was a government actor in *Kirby*. Second, *Kirby* requires that the community be truly concerned or interested in the particular expression. Even defendants conceded that no one - other than their 70 family members - are interested in anything defendants say and no one welcomes their presence. Third, although the ACLU argues that "the relevant community need not be very large,"[12] everyone agrees that the only community purportedly interested in defendants' actions or speech is the defendants themselves.[13]

Relying on defendants' subjective meaning and motivation behind their signs is curious, at best, considering the facts of this case. Initially, it is important to note that the subjective meaning of defendants' signs is unintelligible. Further, defendant Phelps testified that his motivation was retaliation. Certainly, the jury and district court must be allowed to believe defendants' own testimony. On the other hand, the jury or district court is not required to believe defendants' unintelligible self-serving statements.

---

[12] *Citing Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F. 3d 122, 132 (1st Cir. 1997).

[13] Any argument that the press is interested because the press videos and interviews defendants simply misses the point. If, for example, individuals brought a circus to a funeral, the press would cover the curious behavior. If the press were truly interested in defendants' activities and words, the press would cover protests in Topeka, Kansas or Phelps' sermons at WBC. The press is present because of the funeral disruption.

(ii)    The jury only considered the signs that targeted the Snyder family.

The testimony was patently clear.  Plaintiff was only offended by the signs that targeted his son, family and religion.  Even if the Court determines, for example, that "God Hates the U.S.A." is in some way non-admissible, there is no reason to reverse the verdict.  Again, plaintiff's testimony established that only certain signs targeted the Snyder family.  Importantly, defendants displayed hundreds, if not thousands, of signs when they played their sign videos.  (*See* Sign Movies at Defendants' Trial Exhibits, 41a-f.)  Stated differently, plaintiff's evidence concerning signs was dwarfed in comparison to defendants' own presentation of  signs.  Thus, admitting evidence that might not otherwise be admissible is harmless error.

In summary, both amicus briefs argue, without just saying it, that *Times v. Sullivan* and *Hustler Magazine v. Falwell* should be extended to private versus private actors.  Indeed, this extension of the law would require the Court to conclude that private parties acting in a private capacity and unofficial conduct must meet some undetermined and heightened burden of proof or malice.  Ironically, Mr. Snyder did prove malice.  If the facts of this case rise to the level of "public concern," any incomprehensible actions and unintelligible words could be excused as a matter of supposed public concern based upon the speaker's

31

subjective intent. A civilized society deserves better - a man that gave his only son to his country deserves better - Matthew Snyder deserves better.

## VII.   CONCLUSION

Based upon the facts of this particular case and law as applied to these facts, this Court should affirm *Snyder v. Phelps*, 533 F. Supp. 2d 567 (D. Md. 2008).

Respectfully submitted,

BARLEY SNYDER LLC

s/ Sean E. Summers
_____
Sean E. Summers
100 East Market Street
P.O. Box 15012
York, PA 17405-7012
(717) 846-8888

Craig T. Trebilcock
Shumaker Williams PC
1 East Market Street
York, PA 17401
(717) 848-5134

Attorneys for Plaintiff/Appellee

2373321.1

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitations of Fed.R.App.P. 28.1(e)(2) or 32(a)(7)(B) because this brief contains 6,584 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii), as counted by the word-processor used to prepare this brief.

2.  This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word XP using 14-point *Times New Roman* font.

# CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2008 the Corrected Brief of Appellee was filed and served via the Court's CM/ECF system.

And, further, I certify that on August 11, 2008, the Corrected Brief of Appellee and Supplemental Appendix of Plaintiff/Appellee are being filed and served by first class mail addressed as follows:

Clerk, Attn: Sarah A. Carmichael
U.S. Court of Appeals, 4th Circuit
1100 East Main Street, Ste. 501
Richmond, VA 23219-3517

Margie J. Phelps, Esq.
3734 SW 12th Street
Topeka, KS 66604

Deborah Jeon, Esq.
ACLU Foundation of Maryland
3600 Clipper Mill Road, Ste. 350
Baltimore, MD 21211

David T. Schur, Esq.
Joel Kleinman, Esq.
Ranga Sourirajan, Esq.
Dickstein Shapiro, LLP
1825 Eye Street, NW
Washington, DC 20006-5403

Steven R. Shapiro
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004

John Joshua Wheeler, Esquire
Thomas Jefferson Center for the Protection
  of Free Expression
400 Peter Jefferson Place
Charlottesville, VA 22901

Jeffrey I. Shulman
Georgetown University Law Center
600 New Jersey Ave., NW
Washington, DC 20001

                        BARLEY SNYDER LLC

                           s/ Sean E. Summers
By:_____
                        Paul W. Minnich
                        Sean E. Summers
                        100 East Market Street
                        P.O. Box 15012
                        York, PA 17405-7012
                        (717) 846-8888

Date: August 11, 2008